**EVVTEX CO., INC., Plaintiff,**

v.

**HARTLEY COOPER ASSOCIATES LIMITED, Gibbs Hartley Cooper Limited, Underwriters of Lloyd' at London, Defendants.**

No. 92 Civ. 9417 (RWS).

United States District Court,
S.D. New York.

Jan. 17, 1996.

Lawrence B. Newman, New York City, for Plaintiff.

Abrams & Martin, P.C., New York City by Norman Landres, Of Counsel, for Defendants.

SWEET, District Judge.

Plaintiff Evvtex Co., Inc. ("Evvtex") initiated this action against defendant Hartley Cooper Associates Limited and Gibbs Hartley Cooper Limited (collectively "Hartley Cooper") to recover sums collected by Hartley Cooper in its capacity as insurance broker and paid over to a third party John A. Finch Associates, Ltd. ("Finch"). After a trial before the Court and upon all the prior proceedings and the findings and conclusions set forth below, judgment will be granted in favor of Evvtex in accordance with the discussion below.

### The Parties

Evvtex, a wholesale dealer of diamonds, is a Texas corporation with a principal place of business located in New York and a sales office in Dallas. David Moussazadeh ("David") is the president of Evvtex and in charge of its New York office. Abraham Moussazadeh ("Abraham") is vice-president and in charge of its Dallas office. Gibbs

Hartley Cooper Limited ("Gibbs Hartley Cooper") is a United Kingdom corporation with a principal place of business located in London, England. Hartley Cooper Associates Limited ("Hartley Cooper") is a subsidiary of Gibbs Hartley Cooper and is an approved insurance broker qualified to obtain insurance from Underwriters of Lloyd's of London ("Lloyds").

John A. Finch, and the entities he controlled, including John Finch Associates, ltd., Levmore Finch, and Finmore Excess, Inc. (collectively referred to as "JFA" or "Finch") did business in New York, New York, as a New York State licensed excess line insurance broker. Finch had been Evvtex's broker since 1986, and had attended to all of Evvtex's jewelry insurance needs since that time. Prior to 1986 Finch had worked for several years at Lloyds and was familiar with the manner of its operation.

### Prior Proceedings

Evvtex filed its complaint in this action on December 30, 1992 and an amended complaint on March 17, 1994 alleging breach of contract, breach of fiduciary duty, breach of duty to prevent foreseeable risk of harm, and vicarious liability based upon the acts of Finch. The action was initially assigned to the Honorable Pierre N. Leval and reassigned to this Court upon his elevation to the Court of Appeals. On March 30, 1995 summary judgment was granted dismissing Lloyds on the grounds that Hartley Cooper was acting as broker for Evvtex and as such received the sums at issue from Lloyds thus discharging its liability.

After discovery was completed, the action was tried before the Court on November 20 and November 21, 1995, and considered submitted at that time.

### The Issue

The acknowledged chief villain in this case is Finch, the New York insurance broker who it is conceded made off with the moneys provided by Lloyds in accordance with their underwritten policy. Both the London brokers and the insured were victimized by Finch. Both cooperated unwittingly in Finch's scheme to defraud. The issue to be resolved is which must bear the loss, an issue resolved in favor of Evvtex as a result of the relationship of the parties.

### The Facts

In May 1991, Evvtex purchased Jewelers' Block Policy No. ZJB9012467–351 and Policy No. ZEB9100848–354 which was obtained from Finch who placed the order for the policy through Hartley Cooper with Lloyds. Evvtex had commenced doing business with Finch in 1986. The policies purchased from Lloyds were never physically delivered to Evvtex by Hartley Cooper. The policies covered the loss of goods by theft from the business premises of Evvtex for the period August 4, 1991 to August 4, 1992.

On October 9, 1991, Evvtex made timely payment for the premium due under the policy by tendering to Finch the premium payment by check in the amount of $34,100 which was $2,000 less than the invoice submitted to Evvtex by Finch. The premium payment was deposited into Finch's account No. 3–072157 at the Merchant's Bank of New York, 62 West 47th Street, New York, New York.

Hartley Cooper commingled in their bank accounts premium payments received from other brokers to be forwarded to insurers with claims payments received by underwriters to be transmitted to the insured. As a matter of course, and known to Hartley Cooper, Finch also commingled premium payments received from insured to be forwarded to Hartley Cooper and ultimately transferred to the underwriters with claims payments received from Hartley Cooper from the underwriters to be forwarded to the insured. Hartley Cooper maintained an ongoing account with Finch and would "set off" or "net out" premium payments owed by Finch with the claims payments forwarded to Finch.

In 1991, Hartley Cooper was having difficulty collecting premiums paid by the assured from Finch who was behind in forwarding premiums for over two years despite the extensions of time to permit premiums to be collected. By the end of 1991, the Finch businesses owed Hartley Cooper approximately $2,000,000, despite the steps taken to alleviate the problems Hartley Cooper had had with Finch.

On or about November 8, 1991, Evvtex suffered a loss of goods by theft from its premises in excess of $735,204.70.

London was notified of the loss, an insurance adjuster, Horizon Public Adjusters Group, Inc. ("Horizon"), was retained by Evvtex for a percentage of the settlement proceeds, and accountants prepared the necessary inventory and accounting which established the loss at over $830,000.

Negotiations were conducted by insurance adjusters for the parties. On March 19, 1992 a proof of loss was submitted by Evvtex for the agreed upon amount of $735,204.70. The Proof of Loss required "that the check in payment of claim be made payable to the assured and Horizon Public Adjusters Group, Inc." was Evvtex's insurance adjuster. It was anticipated that payment by Lloyds would be accomplished in 60 to 90 days.

On March 25, 1992, on Evvtex's letterhead, a letter was written to authorize Hartley Cooper to deduct a discount service fee for the advancement of Hartley Cooper funds to the assured in advance of Hartley Cooper's collection of the settlement monies from the underwriters. The letter stated, "Please advance payment of my claim as discussed. We agree on a discount service fee of 1½%."

The typeface of this March 25, 1992 letter is different from that of the typeface found on all other letters from Evvtex, and the signature is not that of David, the principal of Evvtex. David signed his full name, "David Moussazadeh," on the proof of loss, the premium check and all other documents signed in an official capacity on behalf of Evvtex. The text of the letter is skewed and appears as though the text was haphazardly taped onto a letter previously sent on Evvtex stationery.

Evvtex did not authorize Finch to create the letter of March 25, 1992 or to transmit it to Hartley Cooper and was not informed of the letter or of the possibility of an advancement of the funds service fee. The letter, it can be inferred, was created by Finch as part of his effort to satisfy his obligation to Hartley Cooper and others. Finch faxed the March 25, 1992 letter to Hartley Cooper.

Finch sent a handwritten fax from Finch to Geoffrey Berrill ("Berrill"), who was filling in for John Evans ("Evans"), the director of Hartley Cooper most familiar with Finch and the Evvtex matter, having discussed it with David in New York prior to the settlement. Evans was skiing in the Alps. This fax was received March 31, 1992, stating that the insured was most anxious to receive the settlement proceeds as quickly as possible and had agreed to pay Hartley Cooper a 1½% discount service fee in exchange for advancing the money prior to its actual receipt from Lloyds.

Hartley Cooper by an April 2, 1992 letter from Berrill requested "written confirmation from the client that we [Hartley Cooper] can deduct the outstanding premiums US $27,000 gross, being 3 installments." The April 2, 1992 letter also specified that the gross claim would be paid less the deduction for the service fee and outstanding premium. Payment was to be made to the Maxson Young bank account, attention Russ York, who would arrange for settlement including the loss payees. Maxson Young was Hartley Cooper's insurance adjuster. The April 2, 1992 letter requested the number of the bank account of Maxson Young for the transfer of the sums and a written confirmation of the insured of the deduction of the outstanding premiums.

On April 2, 1992 Evvtex's principal, David, was skiing in the Rockies. Abraham had come from the Texas office to manage the New York office while David was away. Abraham received a fax from Finch with a cover sheet requesting that the accompanying letter be typed on Evvtex stationery and faxed back to Finch. The letter stated, "Please telex funds to account number 310264022. This is in accordance with Hartley Cooper Associates' letter 2 April 1992." Neither Abraham nor David ever saw the Hartley Cooper April 2, 1992 letter, but Abraham was informed that the letter to be transcribed onto Evvtex letterhead was a mere formality and was necessary for the processing and receipt of Evvtex's claims monies.

Abraham complied with Finch's request and typed a letter on Evvtex stationery dated April 2, 1992 stating:

> As per conversation with John Finch Associates amd [sic] in reference to my claim, please telex funds to Republic National Bank, 452 Fifth Avenue, New York, New York 10018, for the account of John Finch Associates, premium account, account number: 310264030
>
> The final settlement between John Finch [sic] and Associates and Evvtex Company will take place immediately after confirmation of receipt.
>
> This in accordance with Hartley Cooper Associates letter 2 April 1992.

Hartley Cooper received the Evvtex April 2, 1992 letter by fax on or about April 2, 1992. The Evvtex letter did not specifically authorize a deduction for outstanding premiums from the settlement sum and set forth the account number for Finch's premium account, rather than the requested number for Maxson Young. Furthermore, there is no authorization as required by N.Y.Ins.Law § 2119 for Hartley Cooper to deduct a 1 and ½% service fee. The discrepancies between what was requested by Hartley Cooper and what was received put Hartley Cooper on notice that the assured, to whom it owed a fiduciary duty, was not receiving the same instruction that had been transmitted to Finch. Despite these discrepancies, Berrill authorized the transfer of the $697,176.62 settlement sum, less the deduction of $27,000 for unpaid premiums and $11,028.08 representing 1 and ½% service fee from the total settlement sum of $735,204.70, by wire transfer system to Finch's premium account number 310264030 at the Republic National Bank, New York, New York. These deductions were not made known and the settlement sum was not paid to Evvtex. Within days of forwarding its own funds to Finch, Hartley Cooper received from the Underwriters Evvtex's settlement sums in full.

The problems with Finch and its accounts led Hartley Cooper in the spring of 1992 to hire Albis Associates ("Albis"), a management consulting firm, to investigate the financial condition of Finch. In its initial report of April 8, Albis concluded that the principal problem was Finch's collection of premiums. By its report of April 29, it concluded that the problem extended beyond collection and bookkeeping.

In June 1992, David telephoned Evans to inquire about the payment in accordance with the settlement. This was the first notice to Hartley Cooper of the possibility that Evvtex had not been paid. When Finch failed to remit payment to Evvtex by August, Evans suggested that Evvtex file a complaint with the appropriate authorities. Evvtex sought to resolve the matter directly with Finch and failing that did complain to the New York State Insurance Department. The complaint was made jointly by Evvtex and Hartley Cooper.

In October 1992, Evvtex received checks totalling $200,000 from Finch's father who was being advised by Evvtex's principals of the situation and the possibility of criminal prosecution against his son. In mid-November 1992, Finch signed two confessions of judgment totalling $600,000. $35,000 was paid by Finch to Horizon in satisfaction of its public adjuster's lien.

On or about January 1993, the New York State Department of Insurance instituted an administrative proceeding against Finch and the entities he controlled, including John Finch Associates, Ltd., Levmore Finch, Inc., and Finmore Excess, Inc., which resulted in the administrative Hearing Officer's recommendation of revocation of his New York Insurance Broker's license and/or denial of his pending application for licenses or renewals thereof.

Finch was then arrested on February 26, 1993 pursuant to an indictment for grand larceny in the second degree issued by a grand jury of the county and state of New York. He was thereafter held at the Rikers Island Correctional Facility in lieu of bail. On or about May 24, 1993 after bail in the amount of $165,000 was posted, Finch was released from Rikers Island Correctional Facility, New York, New York, pending his criminal trial. He pled guilty and was sentenced. $165,000 was recovered by Evvtex as part of the bail posted on Finch's behalf with the Clerk of New York County.

## Conclusions

### The Court Has Jurisdiction

There is no dispute with respect to the facts underlying the Court's diversity jurisdiction under 28 U.S. § 1332, and Hartley Cooper has not raised any jurisdictional defenses.

### New York Law Applies

 Hartley Cooper has voluntarily subjected itself to the jurisdiction of this Court and *Erie R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938) requires the application of the law of the state in which it is sitting where its jurisdiction is based upon diversity of citizenship. Federal courts sitting in diversity must apply the choice of law rules of the forum state. *Klaxon Co. v. Stentor Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941). New York law requires courts to apply the law of the jurisdiction "which has the most significant contacts with the matter in dispute." *Auten v. Auten,* 308 N.Y. 155, 160, 124 N.E.2d 99 (1954); *see also Fleet Messenger Serv., Inc. v. Life Ins. Co.,* 315 F.2d 593, 596 (2d Cir.1963) (applying Auten to insurance contract); *Philips Consumer Electronics Co. v. Arrow Carrier Corporation,* 785 F.Supp. 436, 442 (S.D.N.Y.1992), *aff'd* 999 F.2d 537 (2d Cir.1993). In cases involving insurance contracts, important factors considered by New York courts in making this determination include the "location of the insured risk, residence of the parties, and where the contract was issued and negotiated." *Avondale Indus., Inc. v. Travelers Indemnity Co.,* 774 F.Supp. 1416, 1423 (S.D.N.Y.1991) (quoting *Munzer v. St. Paul Fire & Marine Ins. Co.,* 145 A.D.2d 193, 200–01, 538 N.Y.S.2d 633, 637 (3d Dept.1989)); *see also Olin Corp. v. Insurance Co. of North Am.,* 743 F.Supp. 1044, 1049 (S.D.N.Y.1990), *aff'd* 929 F.2d 62 (2nd Cir.1991).

In this case, the "location of the risk" was in New York where the loss occurred. New York is also Evvtex' principal place of business. Finch was located in New York. The New York contacts are significant and, in fact, there is no dispute between the parties as to the choice of law. New York law will apply.

### The Agent Has a Fiduciary Duty to the Insured

 The fiduciary duty of a broker to its insured, as outlined in 2120 of New York Insurance Law is merely a codification of the long-standing common law which generally considers broker's agents of their insured. That agency capacity connotes a fiduciary relationship which requires only the highest levels of loyalty, skill, and obligation between principals and agents. The code of conduct for Lloyds' brokers defines brokers as agents of their insured and it is the law of this case that Hartley Cooper was acting as the insured's agent, and not the agent of the underwriters. Therefore, Hartley Cooper must be held to the same standards in its relationship with the insured in its capacity as both a broker and a fiduciary.

The courts in New York have long held that insurance brokers act as agents on behalf of an insured and not the insurer. *Bohlinger v. Zanger,* 306 N.Y. 228, 117 N.E.2d 338 (1954). The status of an insurance broker as an agent of the insured has been codified at § 2101 of the New York Insurance Law.

> An "insurance broker" means any person, firm, association or corporation who or which for any compensation, commission or other thing of value acts or aids in any manner in soliciting, negotiating or procuring the making of an insurance or annuity contract or in placing risks or taking out of insurance, *on behalf of an insured ...*

N.Y.Ins.Law 2102(c) (McKinney 1995) (emphasis added); *Augustin v. Gilot,* 152 Misc.2d 666, 667–72, 578 N.Y.S.2d 348 (N.Y.Civ.Ct., Kings Cty.1991), *rev. on other grounds,* 158 Misc.2d 627, 606 N.Y.S.2d 514 (N.Y.Sup.1993).

In an effort to "relieve the insured from all risks stemming from a broker's possible dishonesty or insolvency," *Bohlinger v. Zanger,* 306 N.Y. 228, 237, 117 N.E.2d 338 (1954), the legislature enacted § 121 which was recodified and renumbered at § 2121(a) in 1984. *See Augustin v. Gilot,* 152 Misc.2d 666, 578 N.Y.S.2d 348. Section 2120 states that:

> Every insurance agent and every broker acting as such in this state shall be respon-

sible in a fiduciary capacity for all funds received or collected as insurance agent or insurance broker, and shall not, without the express consent of his or its principal, mingle any such funds with his or its own funds or with funds held by him or it in any other capacity.

N.Y.Ins.Law § 2120(a) (McKinney 1995).

■ In the broker's fiduciary capacity, it holds premiums collected by its insured to be forwarded to the insurance company as an agent of the insurer. Payment of premiums to the broker is deemed to be payment to the insurance company. *Bohlinger v. Zanger,* 306 N.Y. 228, 117 N.E.2d 338; *Augustin v. Gilot,* 152 Misc.2d 666, 671–72, 578 N.Y.S.2d 348.

■ Section 2120 has therefore been interpreted to extend insurance brokers' fiduciary duties to insurers as well as insured. Reading § 2120 and § 2121 together, as more fully set out herein, the broker acts in a fiduciary capacity whether collecting premiums to be forwarded to the insurer or transmitting claim and/or settlement sums from insurers to insured. Acting in a dual fiduciary capacity, the London broker is statutorily prohibited from commingling the funds held on behalf of the insured with funds held in New York on behalf of the insurer.

### The Premium Fees Deducted by Hartley Cooper are Due to Evvtex

■ Under § 2121(a) of the New York Insurance Law, a broker acts on behalf of the insurance company when it collects premium payments. N.Y.Ins.Law § 2121(a) (McKinney 1995); *Augustin v. Gilot,* 152 Misc.2d 666, 578 N.Y.S.2d 348 (N.Y.Civ.Ct., Kings Cnty 1991). As long as payment is timely received by the broker, the insurance company is deemed to be paid by the insured upon the insured's payment to the broker. *Id.* It is therefore the responsibility of the insurer, rather than the insured, to ensure that the premiums paid to the broker are forwarded to the insurer. The insurer holds the broker responsible for any and all premiums which the broker fails to transfer to the insurer since the broker acts on the insurer's behalf in this regard. Thus, the insured is statutorily insulated from any wrongdoing on the broker's part in regard to premium sums collected.

■ Here, for the purposes of premium payments, Finch was acting on behalf of the insurer and payment made promptly to Finch by Evvtex constituted payment to the insurer. Any failure of a broker to remit said premiums to the insurance company is a breach of the broker's fiduciary duty to the insurance company for which the insurer, and not the insured, must seek redress from the broker. *See Bruckner Plaza Assocs. v. The Generali Ins. Co. of Trieste & Venice,* 172 A.D.2d 408, 568 N.Y.S.2d 786 (N.Y.App. Div., 1st Dept.1991); *Bohlinger v. Zanger,* 202 Misc. 481, 116 N.Y.S.2d 254 (N.Y.Sup.Ct. 1952), *aff'd,* 280 A.D. 917, 115 N.Y.S.2d 918 (N.Y.App.Div., 1st Dept.1952), *modified,* 306 N.Y. 228, 117 N.E.2d 338 (1954), *reh'g denied,* 306 N.Y. 228, 117 N.E.2d 338 (1954).

■ If a broker advances its own funds to the insurance company as premium payment of the insured, then the broker becomes the insured's creditor. Nonetheless, any return premiums or sums received by the broker from the insurance company to be forwarded to the insured are held as fiduciary funds and may not be set off by any sums owed by the insured to the broker. *Sheehan Carriers Inc. v. James H. Buckley and Sons,* 672 F.Supp. 759, 760 (S.D.N.Y. 1987). A broker may not set off or perform "counter accounting" for sums advanced for premium payments to the insured from funds held in a fiduciary capacity to be transferred to the insured.

In *Diesel Motors Co. v. Kaye,* 74 Misc.2d 302, 345 N.Y.S.2d 870 (N.Y. County Ct.1973), an insurance broker advanced sums on behalf of the insured in lieu of premium payments to the insurance company. The policy was eventually cancelled, and when the unearned premiums were remitted to the broker, the broker subtracted the sums owed by the insured to the broker from the return premiums held in a fiduciary capacity to be remitted to the insured. Although the broker may have had a valid claim against the insured for sums previously advanced, it cannot retain such sums and subtract them from funds held as a fiduciary which were received by

the insurance company to be transferred to the insured.

> There is no merit to the contention advanced on behalf of the broker ... [T]he obligation of a broker (who had advanced funds to pay the insured's insurance premiums) to return unearned premiums after cancellation is that of a fiduciary (Insurance Law, at 125) [currently codified at Section 2120], and, absent the actual transfer of a property right in the fund, such obligation is the same whether he is engaged in the business of an insurance premium finance agency ..., or, as here, he makes voluntary advances ...

*Diesel Motors Co. v. Kaye*, 74 Misc.2d at 307, 345 N.Y.S.2d 870 (citations omitted). Therefore, it is impermissible to set off sums advanced for premium payment to the insurer from funds remitted from the insurance company and held as a fiduciary for the insured. *Id.; Sheehan Carriers v. James H. Buckley and Sons*, 672 F.Supp. 759 (S.D.N.Y.1987). Any such set-off is a breach of the broker's fiduciary duty to the insured.

Under § 2120 of the New York Insurance Law, funds held by a broker are done so in the broker's fiduciary capacity and amount to trust funds.

> Under New York's statutory and decisional law, an insurance broker is a fiduciary. New York considers the insurance broker to be a fiduciary for the insured with respect to all funds received or collected from the insurer so that [settlement sums or] unearned premiums returned to the insurance broker by the insurer for remittance to the insured are held by the broker as a fiduciary, and cannot be set off against money owed the agent by the insured.

*In re Jardula*, 122 B.R. 649, 656 (Bkrtcy. E.D.N.Y.1990) (citing *Diesel Motors Co., Inc. v. Kaye*, 74 Misc.2d 302, 345 N.Y.S.2d 870 (Nassau Cnty 1973)). The statute creates an express trust of the funds which come into a broker's possession for the benefit of its principal, the insured.

■ Conversion has been defined as the "unauthorized assumption and exercise of the right of ownership over goods belonging to another to the exclusion of the owner's

rights." *Peters Griffin Woodward Inc. v. WCSC, Inc.*, 88 A.D.2d 883, 452 N.Y.S.2d 599, 600 (N.Y.App.Div., 1st Dept.1982). Since § 2120 of the New York Insurance Law establishes a statutorily mandated fiduciary duty of a broker with regard to funds in its possession and held in trust on behalf of the insured, a broker may not use such funds as if the broker maintained ownership since the insured is the owner of such funds in the broker's possession. The broker is to maintain a separate account of all sums collected on behalf of its insured and has no right whatever to use such funds on its own behalf or on the behalf of another.

The First Department has granted summary judgment to an insured against its broker when its broker refused to remit claims money held by the broker. The broker had no authority to withhold such funds since any monies it received from the insurance company for the insured's claim belonged to the insured and not the broker. Therefore, the First Department granted the claim for conversion of its insurance proceeds as an assignee of the insured's claim. *Buckthorn, Ltd. v. Rollins Burdick Hunter of New York, Inc.*, 109 A.D.2d 8, 489 N.Y.S.2d 729 (N.Y.App.Div., 1st Dept.1985).

■ When Hartley Cooper advanced its own sums in lieu of the settlement sum for Evvtex, it deducted $27,000 in alleged unpaid premiums without written authorization from the insured. Making such a deduction is both a breach of Hartley Cooper's fiduciary duty and a violation of New York Insurance Law § 2120. The premiums withheld in the transfer are due to Evvtex from Hartley Cooper.

### The 1½% Deducted by Hartley–Cooper is Due to Evvtex

■ The $11,000 service fee was also in violation of New York statutory and common law since there was no express written agreement consenting to such a fee. At the time Hartley Cooper set a 1½% fee for the advancement of its funds, the underwriters were remitting settlement sums, within seven days.

New York Insurance Law § 2119 prohibits the receipt of various types of fees and commissions from insurance agents and brokers other than the commissions deductible from premiums on insurance policies. Section 2119(a)(1) prohibits the receipt of funds from various types of services stating that,

> no person licensed as an insurance agent, broker or consultant may receive any fee, commission or thing of value for examining, appraising, reviewing or evaluating any insurance policy, bond, annuity or pension or profit-sharing contract, plan or program ...

Similarly, subsection (b) prohibits any "person licensed as an insurance agent, broker or a consultant" from direct or indirect compensation from the sales of insurance or annuities, securities or trusts without a memorandum or contract for the receipt of fees for related consulting services.

Subsection (c) applies universally to all brokers subject to the jurisdiction of New York and states as follows:

> No insurance broker may receive any compensation, other than commissions deductible from premiums on insurance policies or contracts, from any insured or prospective insured for or on account of the negotiation or procurement of, or other services in connection with, any contract of insurance made or negotiated in this state or for any other services on account of such insurance policies or contracts, including adjustment of claims arising therefrom, unless such compensation is based upon a written memorandum, signed by the party to be charged, and specifying or clearly defining the amount or extent of such compensation.

N.Y.Ins.Law § 2119(c)(1). The inclusion of the word "licensed" in subsections (a) and (b) and its omission from subsection (c) signifies the intent that the prohibition of the receipt of funds in excess of commissions received from premiums without a written memorandum clearly specifying and defining the amount or extent of such compensation is to apply to all brokers and not merely brokers that are licensed in New York State.

New York Insurance Law § 2119 thus forbids the receipt of funds, other than premium payments, by brokers without a separate written contract for such additional compensation. N.Y.Ins.Law § 2119 (McKinney 1995). The section,

> ... flatly forbids receipt of compensation in the absence of the requisite writing. Violation of this prohibition subjects an insurer to substantial criminal and civil penalties. Obviously the statutory scheme reflects a desire on the part of the Legislature to deter brokers from receiving payments in the absence of the requisite writing ... [B]y requiring a writing setting forth the precise amount of such compensation, the Legislature sought to insure that the purchaser of insurance was fully aware that the broker was receiving additional compensation. Otherwise, the insured might be paying such additional compensation without knowing that he was doing so or without knowing the amount of the additional compensation he was paying.

*Aeropulse, Inc. v. Armstrong & Brooks, Ltd.,* 740 F.Supp. 938, 948 (E.D.N.Y.1990). Restitution was held to be the appropriate remedy for the broker's failure to obtain a separate written instrument specifically outlining the fees and commissions charged which were over and above any premium amounts due. The broker's motion for summary judgment in that case was denied because the broker failed to disclose the additional commissions and fees charged to the insured. Not only did the broker breach its fiduciary duty to the insured, but it violated New York Insurance Law § 2119 as well. *Id.* See also *Country–Wide Brokerage, Inc. v. Harnett,* 58 A.D.2d 517, 395 N.Y.S.2d 178 (N.Y.App.Div., 1st Dept.1977).

The $11,000 deduction for early payment was improperly deducted from the settlement award and is due to Evvtex.

### Hartley Cooper is Responsible for the Loss

While the subtext of this case might be a cautionary tale with respect to the unanticipated risks of a ski vacation for both parties, Hartley Cooper failed to perform its duty to the insured properly. The insured Evvtex which was also negligent owed no duty to Hartley Cooper.

As a requirement of the jewelers' block policy of insurance attaching to cover note No. 2829, Evvtex was required to "render to Underwriters a proof of loss signed and sworn to by the Assured." The proof of loss expressly stated at the section entitled "SPECIAL CONDITIONS," that "it is agreed that the check in payment of claim be made payable to the assured and Horizon Public Adjusters Group, Inc."

As a consequence of Finch's forged letter of March 27, Berrill sought through a written authorization from Evvtex to authorize the deduction of $27,000 worth of unpaid premiums from the sums to be advanced by Hartley Cooper for payment to Maxson Young and the number of Maxson Young's bank account in which to forward the funds.

Finch obtained from Abraham the letter on Evvtex stationery, as dictated by Finch which stated:

as per conversation with John Finch Associates and in reference to my claim. Please telex funds to account No.: 310264022. This is in accordance with Hartley Cooper Associates' letter 2 April 1992. Thank you for your assistance. Yours, Evvtex.

The disparity between the information requested by Berrill and that supplied by Evvtex should have put Berrill on notice that the advancement of its sums to Finch's bank account breached the fiduciary duty owed to Evvtex. The "in accordance with Hartley Cooper Associates' letter 2 April 1992" language failed to bridge the gap in the understanding between the parties. It was the broker's duty to perceive and resolve this gap. The letter sent by Evvtex cannot amend the sworn proof of loss as the policy requires payment of the claim pursuant to the sworn statement and makes no provision for amendment to the proof of loss by unsworn statements.

Hartley Cooper, citing *American Soc. of Mechanical Engineers, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 565, 102 S.Ct. 1935, 1942, 72 L.Ed.2d 330 (1982) and *Citibank v. Nyland*, 878 F.2d 620 (2d Cir.1989), states that "even if the representations are untrue and are in fact fraudulent, they may be sufficient to bind the principal." In both of these cases, however, the third party harmed by the acts of the agent were not fiduciaries to the principal. This fiduciary relationship between Evvtex (the principal) and Hartley Cooper (the "third party") presents a situation different from that addressed by defendants' cases, in that while Hartley Cooper acted on representations made by the agent, it simultaneously had a fiduciary duty to the principal which was not present in either of the cases cited.

■ In this case, the more appropriate question is whether or not the broker, Hartley Cooper, exercised reasonable skill, care and diligence when it acted on the apparent instructions from Evvtex. This standard of reasonable skill, care and diligence on the part of brokers is established in New York. *See Brown v. Poritzky*, 30 N.Y.2d 289, 332 N.Y.S.2d 872, 283 N.E.2d 751 (1972). As the insured's agent, the broker must follow strictly the instructions which are clear, explicit, absolute and unqualified. *See Israelson v. Williams*, 166 App.Div. 25, 151 N.Y.S. 679 (2d Dep't 1915), *appeal dismissed* 215 N.Y. 684, 109 N.E. 1079.

■ Hartley Cooper relies on the *Israelson* case and *MetsDonuts, Inc. v. Dairyland Ins. Co.*, 166 A.D.2d 508, 560 N.Y.S.2d 790 (2d Dept 1990) which stands for the proposition that a broker does not have a duty to investigate the reasonableness of the clear instructions of the insured. The situation in the instant case, unlike that in *Israelson* or *MetsDonuts*, presents the duty of a fiduciary with superior information to that of the insured to investigate a directive which is unclear and inconsistent with the information required from the insured. In addition, in this case, Hartley Cooper had reason to question Finch's straightforwardness and thus reason to question the request from the insured. "An agent is subject to a duty to use reasonable efforts to give his principal information which is relevant to affairs entrusted to him and which, as the agent has notice, the principal would desire to have and which can be communicated without violating a superior duty to a third person." *Cristallina, S.A. v. Christie, Manson & Woods International, Inc.*, 117 A.D.2d 284, 293, 502

N.Y.S.2d 165 (1st Dept.1986) (citations omitted). Having information that was important to Evvtex and reason to believe that it might not be known to the principal, Hartley Cooper had a duty to its principal.

Additionally, New York recognizes a duty by a party to a business transaction to speak in three situations: first, where the party has made a partial or ambiguous statement; second, when the parties stand in a fiduciary or confidential relationship with each other; and third, where one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge. *PdP Parfums de Paris, S.A. v. International Designer Fragrances, Inc.*, 901 F.Supp. 581, 586–87 (E.D.N.Y.1995) (*citing Sanford Brass v. American Film Technologies, Inc.*, 987 F.2d 142 (2d Cir.1993)). Given the apparent forgery of the March 27 communication, Hartley Cooper's superior knowledge of the questionable position of Finch, and the ambiguities that the April 2 letter presented, Hartley Cooper had a duty to question Evvtex' request and to investigate the intent of the insured. Failure to alert Evvtex to the ambiguities of its request or to investigate the request, in the peculiar circumstances of this case, represented a failure to exercise its fiduciary duty or reasonable skill or diligence.

### The Damages of Evvtex are Reduced by Sums Received

No authority has been cited by Evvtex to deny Hartley Cooper credit for the sums already received by Evvtex to offset the effects of the fraud committed by Finch, and such a credit will be allowed. This includes the $200,000 received from Finch's father and the $165,000 from Finch's bail money.

Settle judgment on notice in accordance with these findings and conclusions.

It is so ordered.